**The below described is SIGNED.**

**Dated: June 16, 2011**

_William J. Thurman_

**WILLIAM T. THURMAN**
**U.S. Bankruptcy Chief Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH
## CENTRAL DIVISION

| | |
|---|---|
| In re:<br><br>TRI-VALLEY DISTRIBUTING, INC.,<br>COOK OIL COMPANY, INC., and<br>SNOBIRD OIL COMPANY, INC.,<br><br>Debtors. | Bankruptcy No. 01-36562<br>(Substantively consolidated)<br><br>Chapter 11 |
| THE OFFICIAL COMMITTEE OF<br>UNSECURED CREDITORS, and D. RAY<br>STRONG, in his capacity as Examiner for<br>Tri-Valley Distributing, Inc. Consolidated<br>Debtors,<br><br>Plaintiffs,<br><br>v.<br><br>WESTERN UNITED LIFE ASSURANCE<br>COMPANY,<br><br>Defendant. | Adversary Proceeding No. 04-02453 |

## MEMORANDUM DECISION

Over the course of hearings on March 9, March 28, April 1, and April 25, 2011, the Court

has heard the Defendant's Motions for Summary Judgment on Counts I–V of the Second

Amended Complaint ("Complaint") and the Plaintiffs' Motions for Summary Judgment or Partial

Summary Judgment on Counts I–III.  The Court has provided oral bench rulings on each of those

motions in open court and submits now this Memorandum Decision ("Memorandum") to provide

additional clarification and consistency to the issues addressed.  This Memorandum, although the

Court believes is entirely consistent with its prior bench rulings, shall supersede any

contradicting bench rulings made on the Court's record and shall constitute the Court's findings

and conclusions.

## JURISDICTION

The Court has jurisdiction over the subject matter pursuant to 28 U.S.C. §§ 157 and 1334.

This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(L).  Venue is appropriate

under 28 U.S.C. § 1408.  Notice of the hearing on these motions is found to be appropriate and

adequate in all respects.

## FACTS

Because all of the motions seek summary judgment, the only facts the Court can consider

are those not in genuine dispute.  Although if disputed facts exist and the Court considers those

in the light most favorable to the non-movant, the Court can still determine if the movant is

entitled to the relief sought in its motion.  The relevant facts provided to the Court are as follows.

**I.**     **Background**

1.     The Debtors filed for chapter 11[1] relief on November 6, 2001.

_____

[1]     All statutory references are to title 11 of the United States Code (2006) unless
otherwise noted.

2.　　An examiner, Ray Strong, was appointed in February 2003.  The Examiner was granted expanded powers.

3.　　The Debtors were in the business of owning and operating gas stations and convenience stores.  The business entities in bankruptcy are Tri-Valley, Cook Oil and Snobird Oil. Seven C Enterprises, Inc. ("Seven C") is a separate entity formerly owned by principals of the Debtors, but has not filed for bankruptcy protection.

4.　　Seven C held title to most of the real property of the gas stations and convenience stores, including a gas station and convenience store in Rock Springs, Wyoming, ("Rock Springs Property"), and Tri-Valley paid rent or lease payments to Seven C.

5.　　Seven C purchased the Rock Springs Property from Christmann Oil Co. ("Christmann") in October 1993. The deed transferring title to the property from Christmann to Seven C was recorded on October 25, 1993 ("Christmann Deed").

6.　　The purchase was seller-financed and Christmann took back a mortgage to secure the balance due from Seven C. The mortgage was also recorded on October 25, 1993.

7.　　In October 1994, Seven C entered into a 132-month lease of the Rock Springs Property with Tri-Valley.  The lease was signed by Paul Cook on behalf of Seven C, as president, and by Noel Cook on behalf of Tri-Valley, as a 51% owner.

**II.**　　**Postpetition Transfer**

8.　　Prior to the petition date, Tri-Valley attempted to obtain a loan from Star-Mac, an affiliate of Texaco.  Collateral for the proposed Star-Mac loan included the Rock Springs Property and other properties which were then titled in Seven C.

9.　　As a condition for making the loan, Star-Mac insisted that all property being pledged to

3

secure the loan, including the Rock Springs Property, be titled in Tri-Valley.

10. On August 23, 2001, in anticipation of the closing, Paul Cook, as president of Seven C, signed a deed transferring title to the Rock Springs Property from Seven C to Tri-Valley.

11. Wyoming Land Title Company recorded the deed transferring the Rock Springs Property from Seven C to Tri-Valley.  Although there was consideration flowing between Seven C and Tri-Valley on lease arrangements, there was no specific consideration given for the transfer of this property to the Debtor—at least there was no evidence presented of such.

12. Star-Mac "backed out" of making the loan and the loan did not close on August 23, 2001, or at any other time.

13. Paul Cook expected the Rock Springs Property to be transferred back to Seven C if the Star-Mac loan "fell though."

14. Seven C also owned property in Ivins, Utah, which it also leased to Tri-Valley.  On August 26, 2001, Seven C transferred its Ivins property to Tri-Valley for the purpose of obtaining a financial accommodation from Wells Fargo Bank. The Ivins property was transferred back to Seven C on October 22, 2001, when the financing accommodation was not effected.

15. Tri-Valley continued to pay monthly lease payments, including the payment for the Rock Springs Property to Seven C after August 23, 2001.

16. Unlike the Ivins property, the Rock Springs Property was not transferred back to Seven C before Tri-Valley filed its bankruptcy petition on November 6, 2001.

17. The Rock Springs Property was, however, transferred back from Tri-Valley to Seven C by a deed dated November 30, 2001 (the "November 30 Deed").

4

18.   The November 30 Deed was recorded on December 10, 2001.

19.   The November 30 Deed was signed by Noel Cook above the printed word "President."

20.   Tri-Valley's schedules filed December 7, 2001 list Noel Cook as chief executive officer ("CEO") and 51 % shareholder and Paul Cook as president of Tri-Valley.

21.   Filings by Tri-Valley with the State of Utah show Noel Cook as president in all of 2001, however, and not being replaced by Paul Cook as president until February 2002.

22.   Subsequent to the November 30 Deed, Noel Cook signed documents as CEO of Tri-Valley including documents where the Court approved the sale of certain Tri-Valley property.

23.   Paul Cook had no involvement in preparing or executing the November 30 Deed. However, the need to transfer the Rock Springs Property back to Seven C was discussed by Paul Cook and other members of the Cook family and Paul Cook was informed by his father that his father had transferred the Rock Springs Property back to Seven C and Paul Cook approved of that transfer.

24.   The postpetition transfer effected by the November 30 Deed was not disclosed on any of the bankruptcy schedules, amendments or other pleadings or submissions filed by Tri-Valley.

25.   In fact, the schedules showed that Tri-Valley was leasing the Rock Springs Property from Seven C.

26.   The Debtor and other parties involved in the case treated the arrangement between the Debtor and Seven C as a lease arrangement.  That lease between Seven C and Tri-Valley

was assumed as part of the plan of reorganization which was confirmed on December 22, 2003.

### III.   Loans

#### A.   Loan Background

27.   In October 2002, the Cook family entered into a transaction to sell their stock in both Seven C and Tri-Valley to Speedy Turtle Petroleum, Inc. ("Speedy Turtle").

28.   Seven C and Speedy Turtle, as borrowers, entered into loan arrangements with the Metropolitan Mortgage & Securities Inc. ("Metro Mortgage").  The loan was to be secured by various properties, including the Rock Springs Property.

29.   Speedy Turtle funded these purchases by borrowing $6,500,000 from Metro Mortgage (the "Metro Loan").  Seven C was a co-borrower.

30.   The Metro Loan was secured by, among other things, fifteen parcels owned by Seven C, including the Rock Springs Property.  Most of these properties were similar facilities and were leased to Tri-Valley.

31.   In December 2002, the Metro Loan was paid off when Speedy Turtle borrowed $13,779,500 million from the Defendant (the "WULA Loan").

32.   Seven C was one of several guarantors of the WULA Loan and its guarantee included the Rock Springs Property.

33.   The current adversary proceeding was filed on March 19, 2004, challenging the transfer of a security interest in the Rock Springs Property to the Defendant.

B.    *Due Diligence*

34.   The Defendant rejected some of the proposed properties as collateral for its loan because the titles were in Tri-Valley and the Defendant knew Tri-Valley was in bankruptcy.

35.   The Rock Springs Property was included in the loan package.

36.   Old Standard, an affiliate of the Defendant, performed investigation and underwriting with respect to this loan and the Metro Loan.

37.   Old Standard did not request a chain of title report for any of the properties securing either loan.

38.   A 2002 appraisal ordered by the Defendant during the underwriting of its loan stated that the Rock Springs Property had not been otherwise sold or been transferred within the past three years, despite the transfer to and from Tri-Valley which was later discovered by the Plaintiffs.

39.   The only deeds found by the appraisal were the Christmann Deed and a name correction deed transferring the title from Seven "C" to Seven C.

C.    *Insolvency*

40.   According to the Plaintiffs' analysis, the Debtor at the time of the WULA Loan had the following liabilities:

a.    $5,284,482 for the 2005 judgment against Seven C for breach of the standstill agreement (discussed more below);

b.    a liability ranging from $6,889,500 to $13,779,000 for Seven C's guarantee of the WULA Loan with a range on the chance of default from 50% to 100%;

7

c.      $1.27 million for Seven C's conversion of rent payments owed and paid to Tri-Valley but diverted to Seven C (included in the 2003 adversary proceeding discussed below); and

d.      $2,100,000 for Seven C's Dec. 6, 2002 pledge to secure obligations of Tri-Valley to Chevron, Inc.

41.    According to Plaintiffs' revisions and analysis based on a revised 2004 appraisal of Hopkins, the assets of Seven C were no more than $10,558,000.  According to a 2002 appraisal by Hopkins, the value of Seven C's assets were $17,135,000.

42.    The Plaintiffs argue the 2002 Hopkins Appraisal relied on bad information supplied by Ted Hanson, an owner of Speedy Turtle, and that the 2004 revised appraisal should be used.

43.    Most of the Seven C properties were sold for a total of $6,985,000 after Speedy Turtle's default.

44.    Finally, the Plaintiff argues that Mr. Hansen's admission of cash flow shortages at Speedy Turtle shows insolvency was imminent for the Debtor.

        D.      Loan Proceeds

45.    From the WULA Loan, $6,458,083.36 of the proceeds paid off the Metro Loan.

46.    The WULA Loan was also used to satisfy existing tax and mortgage liens against Seven C in the amount of $2,957,613.

**IV.      2003 Adversary Proceeding**

47.    In 2003, Speedy Turtle defaulted on the WULA Loan and the Defendant foreclosed on the Seven C assets that collateralized the loan including the Rock Springs Property.  The

Defendant sold all but three of the Seven C properties including the Rock Springs

Property.  The Rock Springs Property sold for $1,702,546 net of sales commissions.  The

Defendant has escrowed all of the foreclosure sales proceeds.

48.     The Plaintiffs and Defendant stipulated that the bankruptcy court would have sole

jurisdiction of the escrowed funds relating to the Rock Springs sale and these

proceedings.

49.     It is entitlement to these funds that the current adversary proceeding addresses.

50.     In December 2003, the Examiner along with the Committee filed an adversary

proceeding[2] against Seven C seeking damages for breach of an unwritten standstill

agreement between Seven C and Tri-Valley and conversion of assets.

51.     The standstill agreement was not part of the written Seven C stock purchase agreement

between Speedy Turtle and the Cook family as owners of the Debtors.

52.     In December 2005, the Court entered a judgment in favor of the Examiner against Seven

C for approximately $8.7 million for breach of the standstill agreement and conversion of

assets.

53.     Plaintiffs in this present adversary proceeding assert standing to sue the Defendant, in

part, because of the judgment against Seven C.

---

[2]        Adversary Proceeding No. 03-02316.

9

**DISCUSSION**

### I.    Summary Judgment Standard

Summary judgment is appropriate only if "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."[3]   In

determining whether a genuine issue of material fact exists, a court may consider "the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any

. . . ."[4]  The movant must first establish that no genuine issues of material fact exist.[5]  The movant

is not required to negate the non-movant's claim, but can rely on showing a lack of evidence of

an element of the non-movant's claim.[6]  The non-movant must then provide specific facts that

rebut the movant's production and show a genuine issue of material fact does exist.[7]  The non-

movant cannot simply rely on its own pleadings, but must provide competent evidence.[8]  If facts

are in controversy, a court must resolve the issue in favor of the non-movant.[9]

### II.    Count I

The first count of the Complaint alleges a fraudulent conveyance, in the form of a grant of

a security interest in the Rock Springs Property, from Seven C to the Defendant under Utah Code

---

[3]      Fed. R. Civ. P. 56(a); see also Fed. R. Bankr. P. 7056 (making Federal Rule of Civil Procedure 56 applicable in bankruptcy proceedings).

[4]      Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

[5]      See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).

[6]      Adler v. Wal-Mart Stores, 144 F.3d 664, 671 (10th Cir. 1998).

[7]      Nahno-Lopez v. Houser, 625 F.3d 1279, 1283 (10th Cir. 2010).

[8]      Mountain Highlands, LLC v. Hendricks, 616 F.3d 1167, 1170 (10th Cir. 2010).

[9]      Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990).

10

§§ 25-6-5 and 25-6-6.  To establish a fraudulent conveyance under these sections, a plaintiff must

show (1) that the transferor did not receive reasonably equivalent value and (2) that the transferor

fit one of several defined financially troubled states (each of which the Court will articulate and

discuss more below).  Because both sections require a finding of a lack of reasonably equivalent

value, the Court will merge the analysis of these sections.

### A.     Reasonably Equivalent Value

Reasonably equivalent value under the Utah statute has been described as "a price [that] a

capable and diligent businessman could presently obtain for the property after conferring with

those accustomed to buy such property."[10]  The Plaintiffs have argued that the Metro Loan and

the WULA Loan should be treated as one loan for purposes of determining value and that the

only additional consideration that could be considered as applying to the pledge of the Seven C's

property to WULA would be $3,000,000 used to pay off tax and mortgage liens and $400,000 to

cover a loan fee.[11]  Because bankruptcy courts have equitable powers, they can set aside the

---

[10]     Meyer v. Gen. Am. Corp., 569 P.2d 1094, 1097 (Utah 1977); see also Smith v.
Edwards, 17 P.2d 264, 268–69 (Utah 1932) (requiring the value exchanged be "not
disproportionate to the value of the property conveyed"); Utah Assets Corp. v. Dooley Bros.
Ass'n, 70 P.2d 738, 741 (Utah 1937) (citing various authorities to define fair equivalent value as a
equitable and reasonable value, a price at which a willing buyer and willing seller will
exchange, and the highest price a normal purchaser would pay) (internal citations omitted).

        The Utah Supreme Court in National Loan Investors, L.P. v. Givens, 952 P.2d
1067, 1069 & n.2 (Utah 1998), explains that Utah's Uniform Fraudulent Conveyance Act was a
codification of the common law.  The Court thus believes that case law predating the passage of
the Uniform Act continues to be helpful in defining the terms used in the Uniform Act and the
application of those principles.

[11]     Mem. Supp. Pls.' Mot. Summ. J. on Counts I & II 20, ECF No. 256.

formal structure of related transfers to analyze a single integrated transaction.[12]  Insufficient facts

in this case, however, do not give the Court cause to rearrange the loans as a matter of law.  The

Plaintiffs' main contention that the loans were part of the same transaction is that Old Standard

performed the underwriting for both loans and utilized some of the same material from the Metro

Loan for the WULA Loan.  The Plaintiffs, however, did not present evidence to indicate that the

Defendant was committed to making the WULA Loan after the Metro Loan was consummated.

In addition, new documents had to be signed by different people to effect the WULA Loan,

distinct from the Metro Loan.  The Defendant actually disbursed the amount of the WULA Loan,

part of which was used to retire the Metro Loan.  Based on the facts presented to the Court, it

cannot find, as a matter of law, that the equities of the case require the two loans to be treated as

one.  Having rejected that argument, the Court finds, if it includes the full amount of the WULA

Loan as the value provided by the Defendant in exchange for the property interests, that the

Defendant did provide reasonably equivalent value for the transfer of interest from Seven C to

the Defendant.

> B.     *Financial Difficulty*

Having found that the Plaintiffs cannot meet the first prong of the fraudulent transfer

analysis, no further discussion is necessary as the elements are conjunctive.  For the sake of

completeness and because the parties raised other arguments, however, the Court will discuss the

second prong—that of the transferor's financial troubles.  Under Utah Code §§ 25-6-5 and -6,

---

[12]     See Voest-Alpine Trading USA Corp. v. Vantage Steel Corp., 919 F.2d 206,
212–13 (3d Cir. 1990).

those troubles may be shown by insignificant assets, an unsatisfiable debt, a skewed balance sheet, or a failure to pay debts.

### 1.    Insufficient Assets

The first method of showing the transfer was part of a constructively fraudulent transfer is to show that the transferor "was engaged or was about to engage in a business or a transaction for which the remaining assets of the [transferor] were unreasonably small in relation to the business or transaction . . . ."[13]  This factor was not addressed by the parties.  Thus, the Court has no evidence apart from the fact that Seven C effected this transfer in December of 2002 and defaulted on the WULA Loan in the next year.  The only evidence before the Court, then, is that Seven C was able to continue its business into the next year prior to defaulting, which would suggest its assets were not left unreasonably small at the time of transfer.

### 2.    Unsatisfiable Debt

A second way to show a transfer was constructively fraudulent is to establish that the transferor "intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due."[14]  The Plaintiffs provided no evidence of Seven C's intent or belief and thus cannot meet their burden of proof on this element.

### 3.    Insolvent Balance Sheet

A third method of establishing the constructive fraudulence of a transfer is to prove that the transferor was insolvent as established when "the sum of the [transferor's] debts is greater

---

[13]     Utah Code Ann. § 25-6-5(1)(b)(i).

[14]     Id. § 25-6-5(1)(b)(ii).

13

than all of the [transferor's] assets at a fair valuation."[15]  This method was the focus of the

Plaintiffs' insolvency analysis.  In conducting a balance sheet analysis, the Plaintiffs provide the

following comparison of assets to liabilities:[16]

| Liabilities | Amount |
|---|---|
| Tri-Valley Converted Assets | $1,270,000 |
| Standstill Agreement Violation Liability | $5,284,482 |
| Pledge of Assets to Chevron | $2,100,000 |
| WULA Loan Liability (50%–100% contingency) | $6,889,500–$13,779,000 |
| **Total** | **$15,273,982–$22,163,482** |

The Plaintiffs' analysis further assumes an asset value of $10,558,000 based on a modification of

the 2002 Hopkins appraisals.[17]

 While the Court must accept the facts as true for purposes of this analysis, it is not

required to accept the analysis or conclusion at face value.  The Court believes that several of the

listed liabilities are improperly included in this analysis.  In particular, the liabilities for the

conversion of assets and violation of the standstill agreement were not established until a

judgment was entered in 2005 in the adversary proceeding that was commenced in 2003.

Because this liability had not been established at the time of the transfer in 2002, it should not be

included in the analysis of Seven C's insolvency.

---

[15] Id. § 25-6-3(1); see also id. § 25-6-6(1)(b).

[16] See Pls.' Mem. Opp'n Mot. Summ. J. on Counts I & II 49–50, 55–56, EFC No.
279.

[17] See id. at 53.

In addition, because Seven C was only a guarantor on the WULA Loan, its liability must be analyzed as a contingent liability.  Contingent liabilities may be included in an insolvency analysis only in the proportion to the likelihood that the guarantor will be required to satisfy the obligation.[18]  The Plaintiffs provided analyses for a contingency ranging from 50% to 100%, but provided little factual underpinnings for those estimates.  The Plaintiffs further acknowledged that they did not conduct an analysis to determine what the proper contingency percentage would be.  The Plaintiffs pointed to a statement by Ted Hansen that Speedy Turtle was having cash flow problems to indicate that some of that debt was not contingent, but had no additional evidence to provide a specific determination.[19]  Because no evidence exists (and none will be forthcoming[20]) to establish what the actual contingent liability of Seven C would have been, the Court cannot include the contingent liability in the analysis.  Having removed those liabilities from the analysis, the liabilities of Seven C fall below the Plaintiffs' assertion of Seven C's assets, so the Plaintiffs have failed to provide evidence of Seven C's insolvency.

In addition, the Court is persuaded by the Defendant that the adversary proceeding judgment issued in 2005 for conversion of assets and for violation of the standstill agreement could be collaterally attacked by the Defendant if it were to be used by the Plaintiffs against the

---

[18]    See Stillwater Nat'l Bank & Trust Co. v. Kirtley (In re Solomon), 299 B.R. 626, 639 & n.55 (10th Cir. B.A.P. 2003).

[19]    Although Hansen's comment could produce a fact question that would not be suitable for summary judgment, because no additional evidence is or will be available (based on the Plaintiffs' statement that they did not conduct a contingency analysis), the Court can still find that insufficient evidence exists to determine how much of the contingency liability should be passed through to Seven C for purposes of the insolvency analysis.

[20]    See note 19.

Defendant.[21]  The Court, therefore, declines to include that amount in the liquidation analysis for this additional reason.

4.        Unpaid Debts[22]

A final method of demonstrating insolvency is to establish that a transferor "is generally not paying [its] debts as they become due . . . ."[23]  The Plaintiffs appear to point primarily to Seven C's failure to make payments on the WULA Loan as evidence that it could not make its payments when due.  The only debt the Plaintiffs have established that Seven C was not paying was the WULA Loan and the Court is disinclined to find a default on that one loan to be sufficient evidence to raise the presumption of insolvency.

C.        *Good Faith Defense*

Regardless of the above analysis, the Court believes that the Defendant is protected by the good faith defense provided in these sections.  Because a good faith defense will be addressed more fully later in this memorandum, the Court will postpone the current discussion until that time.

---

[21]       The Defendant was not a party to the 2003 adversary proceeding nor in privity with the defending party to validate the application of res judicata or issue preclusion principles. See generally Plotner v. AT&T Corp., 224 F.3d 1161 (10th Cir. 2000) (providing the elements necessary to apply issue preclusion).

[22]       The Court recognizes that under Utah law, a failure of a debtor to pay debts as they come due produces only a presumption of insolvency, see Utah Code Ann. § 25-6-3(2), but for purposes of this analysis and in the name of conciseness, the Court will not repeatedly draw the distinction between a presumption of insolvency and a conclusion of insolvency, unless specifically stated.

[23]       Utah Code Ann. § 25-6-3(2); see also id. § 25-6-6(1)(b).

**III.**   **Count II**

Count II of the Complaint alleged a fraudulent transfer from Tri-Valley to Seven C under

the Utah Code sections analyzed above.  Due to a mutual misunderstanding of the parties,

however, they did not brief those issues in their memoranda and the Court will not address that

Count at this time.

**IV.**   **Count III**

     *A.*   *Prima Facie Case*

The third count of the Complaint alleges an unauthorized postpetition transfer under §

549 of the Bankruptcy Code.  Section 549 permits a trustee to avoid a transfer of estate property

that was made postpetition and was unauthorized by the Bankruptcy Code.  The parties agree that

such a transfer occurred in this case when Noel Cook signed the November 30 Deed on behalf of

Tri-Valley transferring the Rock Springs Property to Seven C.

     *B.*   *Good Faith Defense*

          1.   Good Faith under §§ 549 and 550

               i.   good faith

The issue in controversy arises from the good faith defenses available to the Defendant

under §§ 549(c) and 550(b).  The good faith defense under §§ 549 or 550 eliminates the liability

of the transferee for the unauthorized postpetition transfer under § 549.[24]  To qualify under either

good faith defense, a defendant must show (1) it purchased in good faith,[25] (2) it provided value

---

[24]   <u>See</u> §§ 549(c), 550(b).

[25]   <u>See</u> Tompkins v. Frey (In re Bel Air Assocs., Ltd.), 706 F.2d 301, 305 (10th Cir. 1983) (defining "good faith purchaser" as "one who buys in good faith and for value"); <u>see also</u> <u>Hopkins v. Suntrust Mortg., Inc. (In re Ellis)</u>, 441 B.R. 656, 664 (Bankr. D. Idaho 2010) (same,

(§ 550) or present fair equivalent value (§ 549), and (3) it did not have knowledge of the voidability of the transfer.[26]

Under § 550, good faith is a "question [of] solely whether the grantee knew or should have known that he was not trading normally but that on the contrary, the purpose of the trade, so far as the [transferor] was concerned, was the defrauding of his creditors."[27]  Similarly, under § 549(c), a transferee cannot have constructive notice of the avoidability of the transfer.[28]  Thus, under either section, a defendant cannot have actual or constructive notice (including inquiry notice) about the avoidability of the unauthorized transfer.[29]

In this case, the Plaintiffs have argued that the Defendant should have known about the

---

specifically in § 549 context).  See generally Ratzlaf v. United States, 510 U.S. 135, 143 (1994) (noting that a term should generally be read with the same meaning throughout a statute).

[26]    See §§ 549(c); 550(b)(1).

[27]    Collier, supra, at ¶ 550.03[2] (citing In re Messenger, 32 F.Supp 490 (E.D.Pa. 1940) (quoting Glenn, Fraudulent Conveyances, § 295 (1931))); see also Bonded Fin. Servs. v. Eur. Am. Bank, 838 F.2d 890, 897–98 (7th Cir. 1988).

[28]    See McCord v. Agard (In re Bean), 251 B.R. 196, 202 (E.D.N.Y. 2000) (compiling cases); see Hopkins, 441 B.R. at 664 (quoting a legal dictionary that defines good faith as "[a] state of mind consisting of honesty in belief or purpose, . . . or absence of intent to defraud or to seek unconscionable advantage").

[29]    Drawing further guidance from the good faith analyses under § 363, "good faith [is] established with respect to a purchaser when both of the following criteria [are] met: (1) the purchaser bought without 'fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders'; and (2) the purchaser paid value, which is defined as at least 75% of the appraised value of the assets."  First State Operating Co. v. Holbrook (In re Lotspeich), 328 B.R. 209, 218 (10th Cir. B.A.P. 2005) (citation omitted).  No evidence has been presented of fraud or collusion between Seven C and the Defendant, and no other bidders existed in this transaction.  Further, the Plaintiffs have not made an argument that if the entire WULA Loan is included in the consideration provided by the Defendant it is still insufficient value, so the Court must assume that the value provided by the Defendant is at least 75% of the value of the assets it received.

18

avoidability of the transfer from Tri-Valley to Seven C because they should have known it was a

postpetition transfer.  They argued that the Defendant should have been more thorough in its due

diligence to find the November 30 Deed.  The title report produced during the due diligence,

however, did not disclose the November 30 Deed, showing only the Christmann Deed and a

name correction deed.  The title report further indicated the property had belonged to Seven C for

at least the past 3 years.  Further, there was no evidence that the November 30 Deed was

recorded prior to the due diligence conducted on the WULA Loan.  Thus, no evidence exists that

the Defendant had constructive notice.  As to actual notice, the Defendant points out that it did

not have actual notice because if it did, it would have rejected the Rock Springs Property as it did

other pieces of collateral that were titled in Tri-Valley's name.  With no evidence that the

Defendant had actual or constructive notice, the Court finds that the Defendant acquired its

property interests in good faith.

ii.      value

The second prong of the good faith analysis varies depending on whether the defense is

claimed under § 549 or § 550.  Section 549 and its analytical case law present a quandary of

statutory interpretation.  Of the various elements a defendant must establish to claim the good

faith defense are a showing of being a good faith purchaser and giving present fair equivalent

value.[30]  As Tompkins shows, to qualify as a good faith purchaser, one of the requirements is to

give "value."[31]  Thus the statute requires a defendant to show it gave value and present fair

equivalent value; the former being easily shown by proving the latter and thus a duplicative

---

[30]      See § 549(c).

[31]      706 F.2d at 305.

19

requirement because a defendant would receive no benefit by showing only the former.

Although courts should attempt to read a statute in a way that gives meaning to each word in a

statute,[32] the evolution of the term of art "good faith purchaser" may prevent the use of such a

canon in this case.  Fair present equivalent value is a higher standard than reasonably equivalent

value and limits the protection to "truly innocent purchasers who have actually paid a fair price in

the transaction."[33]

The less exacting standard of "value" is satisfied by an amount sufficient to support a

contract,[34] and not reasonably equivalent value.[35]  Gross inadequacies in price, however, would

raise concerns of good faith.[36]  In the context of a contract, courts will generally not look to the

adequacy of consideration, only whether the parties bargained for it.[37]

On the facts of this case, the Court finds that the value given by the Defendant in

exchange for the property interests it received was approximately $13.779 million—the entire

amount of the WULA Loan.  The Defendant provided this amount to Seven C, which then used it

to pay off the Metro Loan and various tax and other liabilities.  The Plaintiffs do not appear to

---

[32]    See Astoria Fed. Sav. & Loan Ass'n v. Solimino, 501 U.S. 104, 112 (1991).

[33]    Miller v. NLVK, LLC (In re Miller), 454 F.3d 899, 902 (8th Cir. 2006) (internal citations omitted).

[34]    See Collier, supra, ¶ 550.03[1].

[35]    See Coleman v. Home Sav. Ass'n (In re Coleman), 21 B.R. 832, 836 (Bankr. S.D. Tex. 1982).

[36]    See id.

[37]    See United States v. Crobarger, 343 F. Supp. 2d 1048, 1057 (D. Utah 2004) (quoting 3 Williston on Contracts § 7:21 (4th ed. 2004)).

20

argue that if the Metro Loan payoff amount is included in the calculated value that the amount of given value would not qualify as fair present equivalent value and the Court finds no reason to conclude otherwise.  Thus the Court finds that the value provided by the WULA Loan constitutes fair present equivalent value in this transaction.

Even assuming, however, that the value given by the Defendant should be reduced by the amount of the Metro Loan (as would occur if the two loans were treated as one), the additional value provided by the WULA Loan was admittedly negotiated for and bargained for and would thus constitute sufficient value to support a contract claim, which would be sufficient to satisfy this element of the good faith defense under § 550.

iii.    without knowledge

The third element the Defendant must establish in its good faith defense is that it did not have knowledge of the case or knowledge of the voidability of the transfer.[38]  To establish this lack of knowledge, a defendant must show an "absence of facts 'that would cause a reasonable person to investigate whether the transfer would be avoidable.'"[39]  This test, then, becomes very similar to the analysis of good faith above—whether the defendant had actual or constructive notice of the avoidability of the transfer.  Indeed, most courts appear to focus on whether a defendant knew something was amiss with the transaction and whether value was provided (essentially collapsing the "without knowledge" element and the "good faith" element).  Still, to claim the good faith defense under § 549, a defendant must also show a lack of knowledge of the

---

[38]    See §§ 549, 550.

[39]    Hopkins v. Suntrust Mortg., Inc., 441 B.R. 656, 664 (Bankr. D. Idaho 2010) (citing Robinson v. Home Sav. of Am. (In re Concord Senior Hous. Found.), 94 B.R. 180, 183 (Bankr. C.D. Cal. 1988)).

commencement of the case.[40]

In this case, as analyzed above, the Defendant did not have knowledge of the avoidability

of the transfer and it did not have enough facts that it should have known about the avoidability.

Thus, the Court finds that it fulfills the element under § 550.  Further, the Court notes that

"knowledge of the case" would logically refer to knowledge of a bankruptcy of Seven C—which

does not exist—and thus it would be impossible for the Plaintiffs to establish that the Defendant

had knowledge of the case.

As the Defendant has provided satisfactory, uncontroverted evidence of all 3 elements

under §§ 549 or 550, the Court finds the Defendant qualifies for the good faith defense under

either section.

2.       Return to Good Faith under Utah Code §§ 25-6-5 and -6

A good faith transferee can enforce an obligation occurred to the extent of value given to

the transferor for the transfer.[41]  Two possible definitions of good faith exist under the Utah

fraudulent defense statute.  As argued by the Defendant, one possibility is the definition found in

the Uniform Commercial Code ("UCC").  The other comes from case law.

---

[40]      The Meoli court explains the complexity (and likely redundancy) of the elements
of § 549.  That section requires good faith and lack of knowledge, but good faith is usually
defined, at least in part, as a lack of knowledge.  The Meoli court proposes that §§ 549 and 550
be read as being equivalent—essentially ignoring that "without knowledge" is listed
independently and included in the good faith analysis in § 549, and only requiring a lack of
knowledge of the avoidability of the transfer.  Although one requirement is "without knowledge
of the commencement of the case" and the other is "without knowledge of the avoidability of the
transfer," the Meoli court explains they are generally overlapping because "[i]t would indeed be a
rare circumstance where the transferee would not be aware of the debtor's case yet still be
cognizant of the transfer violating bankruptcy law."  Meoli v. Huntington Nat'l Bank (In re
Teleservices Group, Inc.), 444 B.R. 767, 809–10 (Bankr. W.D. Mich. 2011).

[41]      See Utah Code Ann. § 25-6-9(4)(b).

The UCC defines good faith as "honesty in fact in the conduct or transaction concerned."[42]  No evidence exists of the Defendant's dishonesty, so the Court assumes the Defendant was acting honestly.[43]  Thus, the Court finds the Defendant has met its burden of proof to show it acted in good faith under the UCC definition.

The case law found by the Court comes from a recently decided case from the Utah District Court in Wing v. Williams and explains that good faith is "measured objectively and that 'if the circumstances would place a reasonable person on inquiry of a debtor's fraudulent purpose, and a *diligent* inquiry would have discovered the fraudulent purpose, then the transfer is fraudulent.'"[44]  "To be on inquiry notice, a person must have '[actual] knowledge of certain facts and circumstances that are sufficient to give rise to a duty to inquire further.'"[45]  The Court can see no evidence that would provide the Defendant with actual notice of facts that would impose a

---

[42]     Utah Code Ann. § 70A-1a-201(2)(t); see also Territorial Sav. & Loan Ass'n v. Baird, 781 P.2d 452, 461 (Utah Ct. App. 1989) (applying UCC definition of good faith to Utah fraudulent conveyance law).

[43]     Because of the years of ongoing litigation between these parties, the Court believes its assumption is valid as any allegations of dishonesty would surely have been brought to the attention of the Court in one of these many proceedings.

[44]     Wing v. Williams, No. 2:09-CV-399, 2011 U.S. Dist. LEXIS 25607, *13 (D. Utah Mar. 11, 2011) (adopting Jobin v. McKay (In re M&L Bus. Mach. Co., Inc.), 84 F.3d 1330 (10th Cir. 1996), to apply the same analysis as under § 548(c)) (emphasis in original).

In a Utah Supreme Court case, a party tried to argue it was a bona fide purchaser under Utah Code § 25-1-13 to defeat a fraudulent conveyance claim.  Without specifically addressing whether being a bona fide purchaser was the applicable standard, the court stated, "It is notice, not knowledge, that the purchaser must have, and it need not be actual notice—constructive notice is sufficient to defeat the purchaser's claim."  Meyer v. Gen. Am. Corp., 569 P.2d 1094, 1097 (Utah 1977).

[45]     Haik v. Sandy City, 2011 UT 26, P14 (Utah 2011) (quoting First Am. Title Ins. Co. v. J.B. Ranch, Inc., 966 P.2d 834, 838 (Utah 1998)).

duty to further investigate.  The Defendant's underwriter conducted a title search that provided

no indication of faulty title and no other evidence has been provided which would indicate to the

Defendant that the transfer of the Rock Springs Property could have been improper.

Under either definition, then, the Court determines that the Defendant did not have

knowledge or adequate or sufficient notice about the fraudulent or constructively fraudulent

transfer that rises to the level required in this statute.  Therefore, even if the Plaintiffs could

establish a viable claim under Counts I or III, because the Defendant qualifies for the good faith

defense under Utah law and under the Bankruptcy Code, the Defendant's property interest is not

subject to the Plaintiffs' avoidance powers; summary judgment should be granted for the

Defendant on Counts I and III.

**V.**     **Count IV**

The fourth cause of action alleged in the Complaint is under § 363.  Section 363 provides

the mechanism for a trustee (or debtor in possession) to utilize assets of a debtor.  If the use of

those assets is outside the normal course of business, the trustee must obtain court approval.[46]

The Plaintiffs argue that because the Debtor Tri-Valley did not obtain court approval for the

transfer of the Rock Springs Property, it was an improper transfer in violation of the principles of

§ 363.  In order to not eliminate § 363 from the Bankruptcy Code, the Plaintiffs argue, the Court

should provide a remedy for this unauthorized transfer using § 105(a)[47].

The Court concludes that this claim should be dismissed because § 363 does not create a

---

[46]     See § 363(b)(1).

[47]     The relevant portion of § 105(a) reads, "The court may issue any order, process, or
judgment that is necessary or appropriate to carry out the provisions of this title."

right of action for a trustee (or here by the examiner with expanded powers) to avoid an unauthorized postpetition transfer. The better place to look for a remedy is in § 549 or possibly other code sections or state law. No authority has been cited for the use of § 363 to remedy an unauthorized transfer and the Court can find none. Further, the Court is not prompted to create one in this case—where a Bankruptcy Code section already provides (through § 549) the relief sought by the Plaintiffs under § 105(a), the Court would be unnecessarily overstepping by creating another right of action through § 105(a). Thus, summary judgment should be granted for the Defendant on this Count.

## VI.    Count V

The final count of the Complaint alleges a violation of the automatic stay based on the transfer of the Rock Springs Property postpetition. The automatic stay, however, is designed to protect the estate's assets against *involuntary* transfers by creditors. "In contrast, § 549 provides a remedy to creditors when the debtor . . . initiates an unauthorized [postpetition] transfer of estate property."[48] As the transfer of the Rock Springs Property was effected by the Debtor through one of its principals and/or managers, Noel Cook, the proper section to provide relief for the creditors is § 549. No relief can be granted to the Plaintiffs under § 362 and summary judgment on this cause of action should be granted for the Defendant.

## CONCLUSION

In summary, the Court concludes that the Defendant did provide reasonably equivalent value, fair value, and value for the transfer of the security interest in the Rock Springs Property

---

[48]    Jubber v. Search Market Direct, Inc. (In re Paige), 413 B.R. 882, 913–14 (Bankr. D. Utah 2009).

from the Seven C to the Defendant.  Further, the Plaintiff has not provided sufficient evidence of

the insolvent status of the Debtor to rebut the Defendant's argument for summary judgment.

Finally, the Court concludes that the Defendant qualifies as a good faith transferee, which

eliminates its liability for the unauthorized postpetition transfer from the Debtor to Seven C.

With all of these findings and conclusions, the Court must grant summary judgment on Counts I

and III through V for the Defendant and deny summary judgment on Count III and partial

summary judgment on Count I for the Plaintiff.  The Court's ruling on the parties' motions on

Count II is continued without date.  Separate orders consistent with this Memorandum have been

entered.

_____END OF DOCUMENT_____

oo00–00oo

## SERVICE LIST

Service of the foregoing **Memorandum Decision** will be effected through the

Bankruptcy Noticing Center to each party listed below:

George B. Hofmann
Parsons Kinghorn & Harris
111 East Broadway
11th Floor
Salt Lake City, UT 84111

Kenneth L. Cannon, II
Penrod W. Keith
Durham Jones & Pinegar
111 East Broadway, Suite 900
P O Box 4050
Salt Lake City, UT 84110-4050

Peter W. Billings, Jr.
Douglas J. Payne
Fabian & Clendenin
215 South State Street
Suite 1200
Salt Lake City, UT 84111-2323

Jeffrey W. Shields
Jerome Romero
Troy J. Aramburu
Brock Worthen
Jones Waldo Holbrook & McDonough
170 South Main Street
Suite 1500
Salt Lake City, UT 84101